IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 69022-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| LAVELLE KENNETH JOHNSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 18, 2013 |

BECKER, J. – Lavelle Johnson appeals the judgment and sentence imposed following his convictions for attempting to elude a pursuing police vehicle and first degree driving with a suspended license. Johnson argues: (1) the trial court erred in denying his motion for a new trial when a juror used the Internet to access information about Johnson's past criminal history and (2) the information and special verdict instructions regarding the sentencing enhancement of endangering the public pursuant to RCW 9.94A.834 were defective. Because there is a reasonable possibility that the extrinsic information acquired by the juror influenced the verdict, we reverse and remand for a new trial.

FACTS

Shortly after midnight on October 20, 2010, Detective Edward Chan and Officer Jason Diamond of the Seattle Police Department were conducting surveillance on Lavelle Johnson outside a sports bar in south King County. From a distance of approximately 100 yards, Detective Chan saw Johnson leave the

bar and get into the driver's seat of a black Mercedes. Another man got into the passenger seat of the car. Detective Chan and Officer Diamond testified that they were able to identify Johnson as the driver from previous contacts and from photographs. Detective Chan was also using a telescopic lens to enhance his observation of Johnson.

The Mercedes left the parking lot and began driving the wrong way on Martin Luther King Jr. Way South. Detective Chan discreetly followed the Mercedes in an unmarked car. At one point, the Mercedes executed a U-turn in a residential area and passed Detective Chan at approximately 25 miles per hour. Both Detective Chan and Officer Diamond testified that they could see through the driver's side window and they observed that Johnson was driving. Detective Chan radioed other officers to conduct a traffic stop of the Mercedes.

Officer Aaron Sausman and Detective Benjamin Hughey pulled behind the Mercedes in a patrol car and signaled the Mercedes to stop by activating their lights and siren. The Mercedes did not stop but instead ran a stop sign and accelerated to a high rate of speed. The Mercedes ran another red light and eventually entered I-5 going southbound. Once on I-5, the driver turned off the Mercedes' headlights and proceeded to weave in and out of traffic, accelerating up to 130 miles per hour. The driver eventually left I-5, pulled into an apartment complex parking lot, and jumped out of the Mercedes, which continued to roll and

struck a parked car. The Mercedes' occupants fled on foot. A K-9 unit picked up a scent from the driver's seat and tracked it to Johnson, who was arrested.

The State charged Johnson with attempting to elude a pursuing police vehicle and first degree driving with a suspended license. The State later amended the information to include a sentencing enhancement for endangering the public pursuant to RCW 9.94A.834. The charging language for the enhancement read as follows:

> And I, Daniel T. Satterberg, Prosecuting Attorney for King County in the name and by the authority of the State of Washington further do allege that during the commission of that crime, one or more persons other than the defendant or the pursuing law enforcement officer were threatened with physical injury or harm by the actions of the defendant, which is a special allegation of endangerment by eluding under the authority of Chapter 219, Laws of 2008.

At trial, Johnson admitted the Mercedes was driven in a manner that was "crazy, reckless and erratic" and that put other motorists on the road at risk of injury. Johnson also admitted that his license was suspended and that he had been convicted of prior crimes of dishonesty, including taking a motor vehicle without permission in 2004 and second degree theft and witness tampering in 2007. Johnson's defense to the charges was that his friend was driving the Mercedes and he was the passenger. He argued that both he and his friend were African-American males who were dressed identically and that the officers could not have distinguished between the two men in the dark. He also

contended that the K-9 unit naturally picked up his scent because the Mercedes was his girl friend's car and he frequently rode in it.

At the conclusion of the evidence, the trial court instructed the jury regarding the sentencing enhancement as follows:

> This special verdict is to be answered only if the jury finds the defendant guilty of Attempting to Elude a Pursuing Police Vehicle as charged in Count I.
>
> We, the jury, return a special verdict by answering as follows:
>
> QUESTION: Was any person, other than Lavelle Johnson or a pursuing law enforcement officer, threatened with physical injury or harm by the actions of Lavelle Johnson during his commission of the crime of attempting to elude a police vehicle?
>
> ANSWER: _____ (Write "yes" or "no")

The jury was also instructed that they were not allowed to consider evidence that had not been admitted in reaching their verdict and were to use evidence of prior criminal convictions only for the purposes of assessing the defendant's credibility.

After deliberating over the course of two days, the jury convicted Johnson of both counts as charged. In addition, the jury answered "yes" on the special verdict form for the sentencing enhancement.

After the trial, the deputy prosecutor spoke with some of the jurors. Juror 12 admitted that he had conducted an Internet search of the name Lavelle Johnson at the end of the first day of deliberations. The deputy prosecutor

-4-

appropriately brought this information to the attention of the parties. In an affidavit, juror 12 stated as follows:

1. On December 22, 2011, following the jury's first day of deliberations, I conducted an internet search for the defendant's name – Lavelle Johnson.
2. I found a news article about a person named Lavelle Johnson having a sexual relationship with a corrections officer at a juvenile facility.
3. I was not sure if this person was the same Lavelle Johnson as the defendant.
4. I believe I read the beginning of the article, but did not read the entire article.
5. The information I discovered on the internet did not change my feelings about the case or affect my decision about the verdict. During deliberations on the first day, I had already expressed my feelings about the case.
6. I did not tell the other jurors about my internet search until I was discussing the case in the hallway of the courthouse with [the deputy prosecutor] after the verdict was read.

Johnson filed a motion for a new trial, citing juror misconduct. The trial court denied the motion, making the following findings of fact and conclusions of law:

1. **FINDINGS OF FACT**:

   a. During trial, the Defendant testified and three criminal convictions were admitted at trial for impeachment purposes: Theft in the Second Degree from 2007; Taking a Vehicle without Permission in the Second Degree from 2004; and Attempted Tampering with a Witness from 2007.
   b. The jury was instructed that the Defendant's convictions were to be used for the sole purpose of assessing what weight or credibility to give to the Defendant's testimony.
   c. The Court admonished the jurors to not do any outside research during the trial or deliberations.

    d. Juror 12 conducted an internet search of the Defendant's name, which was juror misconduct.

    e. Juror 12 detailed in his affidavit that he conducted an internet search for Lavelle Johnson after the first day of deliberations on December 22, 2011, and he found a news article about a person named Lavelle Johnson having a sexual relationship with a corrections officer at a juvenile facility; that he was not sure if this person was the same Lavelle Johnson as the defendant; that he believed he read the beginning of the article, but did not read the entire article; that the information he discovered did not change his feelings about the case or affect his decision about the verdict; that he had expressed his feelings about the case to his fellow jurors during the first day of deliberations; and that he did not tell the other jurors about the internet search until he was discussing the case in the hallway after the jury's verdict was read in court.

    f. Juror 12 is credible. There are no other affidavits of jurors and no evidence has been presented that puts Juror 12's affidavit in doubt.

    g. The information found by Juror 12 was in the mind of one juror who did not share it with the other jurors and it was not a part of jury deliberations.

2.    <u>CONCLUSIONS OF LAW</u>:

    The Defendant's motion for a new trial based on juror misconduct is denied for the following reasons:

    a. A juror discovering information about a conviction that would have been inadmissible at trial is juror misconduct.

    b. While juror misconduct did occur, it does not automatically warrant a new trial.

    c. The trial court conducts a fact-finding hearing since it has a better opportunity to consider and weigh whether juror misconduct warrants a new trial because the trial court can look at the facts and circumstances of the case and the trial over which it presided.

    d. Information about a potential juvenile criminal conviction, in light of the three adult felonies admitted at trial, made no difference in the way the jury deliberated, especially since it

was known by only one juror and not shared with the rest of the jury.
   e. The juror misconduct in this case did not prejudice the Defendant's right to a fair trial, and is not grounds for a new trial.

The court also incorporated its oral findings and conclusions into the order.

Johnson appeals his judgment and sentence as well as the order denying a new trial.

## DECISION

Johnson argues that the trial court erred in denying his motion for a new trial based on juror 12's misconduct. The decision to grant or deny a motion for a new trial is reviewed for abuse of discretion. State v. Marks, 71 Wn.2d 295, 302, 427 P.2d 1008 (1967). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Magers, 164 Wn.2d 174, 189 P.3d 126 (2008). The trial court's application of an incorrect legal analysis or other error of law can constitute an abuse of discretion. State v. Tobin, 161 Wn.2d 517, 523, 166 P.3d 1167 (2007).

The consideration of extrinsic evidence by a juror constitutes juror misconduct that may be grounds for a new trial. State v. Pete, 152 Wn.2d 546, 98 P.3d 803 (2004). Extrinsic evidence is defined as "'information that is *outside all the evidence* admitted at trial, either orally, or by document,'" and it is improper "because it is not subject to objection, cross examination, explanation or rebuttal." Pete, 152 Wn.2d at 552-53 (internal quotations marks omitted),

quoting State v. Balisok, 123 Wn.2d 114, 188, 866 P.2d 631 (1994). Once juror misconduct is established, prejudice to the defendant is presumed. State v. Boling, 131 Wn. App. 329, 332, 127 P.3d 740, review denied, 158 Wn.2d 1011 (2006). To overcome this presumption, the State must satisfy the trial court that it is unreasonable to believe the misconduct could have affected the verdict. Boling, 131 Wn. App. at 332. A new trial must be granted unless it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. State v. Briggs, 55 Wn. App. 44, 55-56, 776 P.2d 1347 (1989). The court must make an objective inquiry, asking whether the evidence could have affected the jury's decision, not whether the evidence did in fact affect the decision; the actual effect of the extrinsic evidence on the jurors' decision inheres in the verdict. Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 273, 796 P.2d 737 (1990), review denied, 116 Wn.2d 1014 (1991). The effect of the extrinsic evidence should be evaluated in light of all the facts and circumstances of the trial. State v. Tigano, 63 Wn. App. 336, 342, 818 P.2d 1369 (1991), review denied, 118 Wn.2d 1021 (1992). Any doubt that the misconduct affected the verdict must be resolved against the verdict. Briggs, 55 Wn. App. at 55.

It is undisputed that juror 12's Internet search of the name Lavelle Johnson was misconduct. The critical question is therefore whether the trial court properly analyzed whether reasonable grounds existed to believe that Johnson was prejudiced.

-8-

Johnson argues that the trial court erroneously interpreted the law by making a subjective inquiry into the actual effect of the evidence on the jury instead of an objective inquiry into whether the evidence could have affected the jury's determination. A trial court "may consider only such facts asserted in the affidavits of jurors which relate to the claimed misconduct of the jury and do not inhere in the verdict itself. . . . [T]he effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and . . . inadmissible to impeach the verdict." Cox v. Charles Wright Acad., Inc., 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967). Here, it is clear that the trial court did consider some subjective factors. For example, the trial court made findings that juror 12's statement that his verdict was not affected by the information was credible. Moreover, the trial court noted that juror 12 did not share the information with any of the other jurors. However, it is clear that the trial court's ultimate decision was based on objective factors, including: (1) the fact that the jury was aware of Johnson's criminal history; (2) that the jury was instructed not to use evidence of Johnson's criminal history for any other purpose than to evaluate his credibility; and (3) that the information indicated Johnson was the victim of the corrections officer rather than a willing participant:

> But there were three other offenses that came into evidence. To the extent that this went to the issue of your client's, Mr. Johnson's, credibility, they had far more evidence that was admitted that went to his credibility directly than this would have,

and the jury was instructed specifically they could consider it on the issue of his credibility and could do that legitimately. They were also told that other convictions could not be used for any other purpose. So to the extent that he was of the opinion that this indicated there was another conviction, he was instructed you can't consider for anything other than credibility. This one they shouldn't consider at all.

This is unusual because it raises an issue of sexual misconduct in juvenile hall, but to the extent that it raised the issue of sexual impropriety at a juvenile facility, the defendant would have been the victim of that impropriety rather than the perpetrator legally. He was the victim of a jail officer. And you're right, Mr. Swaby, had you asked to put that into evidence, I would not have let it in. But to the extent that he was previously a victim of a law enforcement officer, it logically would not prejudice him. It would prejudice the law enforcement officer who victimized him.

We hold the trial court applied the appropriate legal standard in assessing prejudice.

However, Johnson also argues that the State failed to prove beyond a reasonable doubt that the misconduct had no effect on the verdict. He contends that the extrinsic evidence was prejudicial because: (1) it alerted juror 12 that Johnson had been incarcerated as a juvenile, making Johnson appear to "be a lifelong offender" and (2) it portrayed Johnson as a person of "dubious moral character" who engaged in a sexual relationship with a corrections officer.

Johnson's only defense was that someone else committed the crimes. Johnson's credibility was therefore paramount in this case. Here, the information acquired by juror 12 directly related to Johnson's credibility. First, "'prior conviction evidence is inherently prejudicial' when the defendant is the witness because it tends to shift the jury focus 'from the merits of the charge to the

-10-

defendant's general propensity for criminality.'" State v. Hardy, 133 Wn.2d 701, 710, 946 P.2d 1175 (1997) (internal quotation marks omitted), quoting State v. Jones, 101 Wn.2d 113, 120, 677 P.2d 131 (1984). We are cognizant of the fact that Johnson's credibility had already been impeached by the admission of his adult crimes of dishonesty. But it is not unreasonable to believe that the knowledge that a defendant began committing crimes as a juvenile could influence a juror to believe that the defendant was therefore an incurable offender who must have committed the crime at issue.

The information was also prejudicial to Johnson because it informed juror 12 that Johnson had previously been involved in a sexual relationship with a corrections officer. The State correctly notes that it is a crime for a corrections officer to engage in sexual intercourse with an inmate over whom they have supervisory power and that Johnson was the victim, not the perpetrator, of the crime. But the risk is too great that any evidence of sexual impropriety could have had a negative effect on Johnson's credibility. See, e.g., State v. Peterson, 35 Wn. App. 481, 485, 667 P.2d 645 (purpose of RCW 9A.44.020, the "rape shield" statute, was "to remedy the practice of producing evidence of a victim's past sexual conduct and attempting to show that there was a logical nexus between chastity and veracity"), review denied, 100 Wn.2d 1028 (1983); State v. Hudlow, 99 Wn.2d 1, 14, 659 P.2d 514 (1983) (information regarding victim's

past sexual conduct "may confuse the issues, mislead the jury, or cause the jury to decide the case on an improper or emotional basis").

The State argues that any prejudice was alleviated by the fact that the jury was instructed to use information about Johnson's prior convictions only to determine his credibility. While jurors are presumed to follow the instructions they are given, "if extrinsic evidence is sufficiently prejudicial, a new trial must be ordered despite admonitions to the jury." Briggs, 55 Wn. App. at 60. Where extrinsic evidence concerns a defendant's prior crimes, "the efficacy of such instructions is subject to serious doubt." Dickson v. Sullivan, 849 F.2d 403, 408 (9th Cir. 1988). We also must reject the State's argument that the information was not prejudicial because juror 12 did not communicate it to any of the other jurors. Even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict. Dickson, 849 F.2d at 408.

While the trial court instructed the jurors that they were to decide the case based only on evidence presented at trial and that they were not to discuss the case with family or friends, the instructions did not specifically caution jurors about the use of the Internet. The Internet has become an integral part of our daily lives, and advances in technology have exponentially increased the risk that jurors will conduct research and investigate the law and facts on their own. This case highlights the importance of jurors being thoroughly and repeatedly admonished not to consult the Internet for information about the case during trial.

We cannot say with confidence that the information obtained by juror 12 could not have affected the verdict. Because any doubts must be resolved against the verdict, we hold that Johnson is entitled to a new trial. As such, it is unnecessary for us to reach Johnson's other claim of error regarding the information and special verdict language for the endangerment enhancement under RCW 9.94A.834.

Reversed and remanded.

Becker, J.

WE CONCUR:

Appelwick, J.